IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THE CADLE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| THOMAS G. KEYSER, LAW OFFICES | § | Civil Action No. 1:14-cv-00758 |
| OF THOMAS G. KEYSER, P.C., | § | |
| MICHAEL G. COLVARD, MARTIN & | § | |
| DROUGHT, P.C. F/K/A MARTIN, | § | |
| DROUGHT & TORRES, INC., JESSE R. | § | |
| CASTILLO, G. WADE CALDWELL, | § | |
| BARTON, EAST & CALDWELL, P.L.L.C. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Plaintiff, THE CADLE COMPANY ("Cadle"), complains of Defendants, THOMAS G.
KEYSER, MICHAEL G. COLVARD, MARTIN & DROUGHT, P.C. F/K/A MARTIN,
DROUGHT & TORRES, INC., JESSE R. CASTILLO, G. WADE CALDWELL, BARTON,
EAST & CALDWELL, P.L.L.C., (together, "Defendants"), and in support thereof would
respectfully show the Court the following:

I.
PARTIES

1.      Plaintiff is an Ohio corporation.

2.      Defendant Thomas G. Keyser is an individual that resides in Texas and is the sole
shareholder of Defendant The Law Offices of Thomas G. Keyser, P.C., a Texas law firm.  Both
can be served at the office address located at 300 Convent St. #2500, San Antonio, Texas 78205
or wherever they may be found.

3.      Defendant Michael G. Colvard is an individual that resides in Texas and is a shareholder of Defendant Martin & Drought, P.C. f/k/a Martin, Drought & Torres, Inc., a Texas law firm.  Both can be served at the office address located at Bank of America Plaza, 300 Convent Street, 25th Floor, San Antonio, Texas 78205 or wherever they may be found.

4.      Defendant Jessie R. Castillo is an individual that resides in Texas and may be served at the office address of Castillo & Snyder P.C. located at Bank of America Plaza, Suite 1020, 300 Convent Street, San Antonio, Texas 78205.

5.      Defendant G. Wade Caldwell is an individual that resides in Texas and is a member of Defendant Barton, East & Caldwell, P.L.L.C., a Texas law firm.  Both can be served at the office address located at One Riverwalk Place, Suite 1825, 700 North Saint Mary's Street, San Antonio, Texas 78205 or wherever they may be found.

## II.
## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court based on 28 U.S.C. § 1332, as there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

7.      Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Western District of Texas because (1) all or a substantial part of the events giving rise to the claim occurred in the Western District; and (2) some or all of Defendants resided in the Western District at the time the events giving rise to the cause of action occurred.

## III.
## INTRODUCTION

This is a legal malpractice action arising from the negligence of Cadle's counsel that resulted in Cadle having to defend itself in 7 years of litigation, which included a jury trial, two appeals, hundreds of thousands of dollars in attorneys' fees, the discharge of more than $90,000 in debt owed to Cadle, and a settlement payment from Cadle.  All of which could have been and

should have been avoided, but for counsels' failure to select a qualified attorney to handle a garnishment proceeding and their failure to remedy the failures of the unqualified attorney in the aftermath that followed.

## IV.
## FACTS

**A.      Cadle hires Defendants to begin collection efforts against Mark T. Davis.**

1.      In 1992, Cadle acquired a note and deed of trust arising out of a Small Business Administration loan taken by Mark T. Davis ("Davis").

2.      Cadle referred the file to attorney G. Wade Caldwell of Martin, Drought & Torres, Inc. n/k/a Martin & Drought P.C. ("M&D") to reduce the debt to judgment and initiate collection efforts against Davis.

3.      Caldwell and M&D agreed to take on the Davis matter.

4.      Caldwell and Davis's counsel negotiated and executed a consent judgment in 1993 in the principal amount of $47,567.41, plus interest, in Cause No. 93-CI-06608, *The Cadle Company v. Mark T. Davis* ("Consent Judgment").  Cadle also maintained its deed of trust lien on a parcel of unimproved land owned by Davis in Comal County, Texas (the "Comal Property").

**B.      Davis sells his real property in Comal County, Texas and Cadle agrees to release its mortgage against the property, but Cadle does not release the Consent Judgment.**

5.      Despite being aware and having a mortgage lien on the Comal Property, Cadle did not foreclose on the Comal Property because there were past-due property taxes and IRS liens against the Comal Property due to Davis's failure to pay personal income and employee 941 taxes in prior years.

6.      In 1994, Cadle deposed Davis and learned that the only asset Davis had at the time was the Comal Property and that he was otherwise deeply in debt.

7.     In 1997, Davis found a buyer for the Comal Property.  The contract price for the Comal Property was $12,500, which was far short of the total amounts owed to either Cadle or the IRS.  Davis needed a release of the IRS and Cadle liens in order to sell the Comal Property.

8.     Davis contacted Cadle regarding the pending sale of the Comal Property and the need to release Cadle's lien.  Pete Barta ("Barta"), of Cadle, told Davis that if he could persuade the IRS to accept a small portion of the proceeds of the sale in order to release the Comal Property from the IRS lien, then Cadle would likewise agree to release its deed of trust in exchange for a portion of the proceeds.  Davis ultimately got the IRS to agree to this arrangement.  Throughout the negotiations, Barta made it clear to Davis and to the title company handling the closing that Cadle would release its deed of trust lien for a share of the proceeds from the sale of the property, but that Cadle would **not** release the debt; namely, the balance owed to Cadle under the Consent Judgment.   There are substantial communications, contemporaneous notes (prepared by Cadle and the title company), and draft closing documents that all make it clear that Cadle never agreed to forgive the balance of the Consent Judgment in exchange for receiving a few thousand dollars from the sale of Davis's property.

9.     In December 1997, Davis closed the sale of the Comal Property (the "Closing").  Out of the sale proceeds, Cadle received $7,500.00 and the IRS received $1,565.28

10.     In exchange for the $7,500.00 received from the sale of the Comal Property, Cadle executed a Release of Deed of Trust dated December 10, 1997.  Cadle's Release of Deed of Trust does not release Cadle's Consent Judgment; rather, the Release of Deed of Trust released only the lien against the Comal Property securing (partial) repayment of the debt owed to Cadle.  After execution of the Release of Deed of Trust, the balance owed under the Consent Judgment remained due and owing to Cadle.  Neither Davis nor his attorney ever presented, or requested, a release of the Consent Judgment to be executed or filed by Cadle.

11.     In exchange for $1,565.28 from the sale of the Comal Property, the IRS executed a Certificate of Discharge of Property from Federal Tax Lien ("Form 669-B") dated January 14, 1998.  The IRS Form 669-B states, in relevant part, that the IRS is accepting the proceeds "in part satisfaction of the liability in respect of the tax [debt of $29,632.68]" and that the IRS reserves "the force and effect of said lien against and upon all other property or rights to property to which said lien is attached, wheresoever situated."    The Form 669-B released the Comal Property from the IRS tax liens filed in Comal County, Texas, and did not release the tax liens. A Form 669-A is filed by the IRS to discharge a tax lien in its entirety, as opposed to merely discharging a property from a federal tax lien.

12.     By 1997, Davis had closed his day care business and was a school teacher and had very limited funds.  After selling the Comal Property, Davis had no further assets to speak of. As a result, Cadle decided to put the Davis file to the side in hopes that Davis would acquire new assets in the future that could be used to satisfy the Consent Judgment.

**C.      Cadle re-initiates collection efforts against Davis.**

13.     In February 2003, Cadle re-initiated collection efforts against Davis and began investigating whether Davis had the ability to start making payments against the Consent Judgment.   To that end, Cadle engaged in negotiations for a payment plan with Davis. Negotiations over the payment plan continued for nearly six months.

14.     In September 2003, Cadle served a writ of execution on Davis.  A Bexar County Deputy Sheriff served the writ on Davis who reported to the Sheriff that he had no money or property to satisfy the Consent Judgment.  There is no reference in the return that Davis believed the Consent Judgment had been previously satisfied.  There is no evidence that Davis made any effort to contact Cadle after being served with the writ of execution.  Rather, Cadle contacted Davis a few days later, and Davis apparently offered to make payments to Cadle to satisfy the

debt and apparently indicated that he somehow "thought this was paid by releasing the property."

15. On November 25, 2003, Cadle requested Davis to provide financial information, including tax returns, personal financial information, and other information to assist Cadle in assessing Davis's financial condition. In response, in January and February 2004, Davis provided financial information and voluntarily provided a $40 good faith check to Cadle. Davis's personal financial statements listed the Consent Judgment as due and owing, but made no reference to an alleged 1997 agreement to satisfy the Consent Judgment. Similarly, the cover letter with the $40 good faith check makes no reference to an agreement to satisfy the Consent Judgment, but rather asks Cadle to negotiate a payment plan. Importantly, Cadle's notes do not reference an agreement for Cadle to release the Consent Judgment.

16. Then, on March 31, 2004, Karen Raleigh ("Raleigh") sent Cadle a cease and desist letter with a concocted theory that Cadle had agreed to release the entire Consent Judgment in 1997, in consideration for receiving $7,500.00 from the sale of the Comal Property. According to Raleigh's bills, the idea of this never-before-mentioned agreement, came up only after Raleigh had studied the lazily drafted title company closing documents, which Raleigh misconstrued. (Indeed, when Davis was later deposed on multiple occasions and questioned at trial, he repeatedly admitted that no one ever told him that the Consent Judgment would be released or that the entire debt would be forgiven as a result of the sale of the Comal Property.)

17. Despite involving counsel in 2004, Davis waited an additional 2 years to file a lawsuit against Cadle, even though Cadle continued to contact Davis and/or Raleigh over the next 2 years in pursuit of collection of the Consent Judgment

**D.** **Defendants grossly mishandle a garnishment of Davis's bank account.**

18. On March 1, 2006, Cadle contacted Michael G. Colvard ("Colvard") of M&D to re-initiate the lawyer handling of collection efforts against Davis. Specifically, Cadle requested

that Colvard initiate a bank garnishment against the International Bank of Commerce ("IBC")

where Davis held an account.

19.     Colvard was provided a cover letter and a copy of Cadle's Terms of

Representation.  At the time, Caldwell and M&D had represented Cadle for several years and

were operating under Cadle's standard Terms of Representation.   Significantly, but without

limitation, the Terms of Representation provide:

> We want only one attorney handling a file for us. If you are too busy or if our file
> is too small for you to handle individually, then please return it to us for
> reassignment. If your associate is not able to handle the entire case without
> another attorney's help, then he or she should not be working on this case . . . .
>
> We do not want any attorney handling our files if that attorney has not had
> extensive work in note collections and related actions.  It is our experience that an
> attorney with ten years experience in handling divorces only is no more capable
> than most first-year lawyers of handling our files.

20.     Cadle also provided an account status that showed the current balance of the

Judgment and showed credits for the $7,500 relating to the Comal Property proceeds and the $40

check sent in 2003.

21.     Colvard informed Cadle's representative, Ted Lance ("Lance"), that M&D

believed it had a business conflict in initiating a garnishment action against IBC directly, but was

confident that M&D could oversee the efforts of a lawyer that officed down the hall from M&D,

who would be Cadle's attorney of record in the garnishment.  M&D assured Cadle that it would

oversee Keyser's efforts.  Cadle was also led to believe that Keyser was competent to handle the

representation.  Indeed, M&D prepared the application for writ of garnishment, accompanying

affidavit, and paid the filing fees for the garnishment.  M&D billed Cadle for preparation of the

garnishment documents.

22.     Based on Colvard's recommendation and his assurance that M&D would oversee

the garnishment and that Keyser was qualified to handle the matter, Cadle agreed to Colvard's

plan to have Keyser be the attorney of record for the garnishment action, with M&D supervising and orchestrating Keyser's actions.

23.     Ted Lance executed the affidavit prepared by M&D and Keyser filed the Application for Writ of Garnishment and Affidavit on March 27, 2006, in *The Cadle Company v. International Bank of Commerce*, Cause No. 2006-CI-04890, 57th Judicial District Court, Bexar County, Texas ("Garnishment Proceeding").  Pursuant to Rule 13, Keyser's signature on the Application for Writ of Garnishment was his certificate to the court that the application was not brought in bad faith or groundless based on a reasonable inquiry.  The garnishment was served on, or about, April 3, 2006, and resulted in approximately $3,200.00 being trapped in Davis's checking account at IBC.

24.     Shortly after the garnishment was filed, Davis retained Troy Glander, an attorney at the law office where Davis's wife worked.  Glander contacted Keyser on April 3, 2006, shortly after Davis was served with the writ of garnishment.  Glander and Keyser were in frequent contact after that.  Glander made it clear from early on that he intended to file a motion to dissolve the writ of garnishment and that the basis would be an alleged 1997 agreement to satisfy the Consent Judgment.  Glander even provided Keyser with copies of the closing documents from the sale of the Comal Property that he intended to rely upon to support the motion.

25.     Although the motion to dissolve had not yet been filed, Glander initially informed Keyser (by letter faxed on April 5, 2006) that he intended to have the motion heard on Friday, April 7, 2006.  Glander later pushed the hearing date to Monday, April 10, 2006, and then again to Wednesday, April 12, 2006.  Keyser was involved in the discussions surrounding each of these settings and was aware of the April 12, 2006, setting, at least by Friday, April 7, 2006.

26.     On April 11, 2006, Glander filed an emergency motion to dissolve the writ claiming (1) Cadle had allegedly failed to credit the Consent Judgment with the proceeds of the Comal Property sale, (2) Cadle allegedly improperly verified the motion, and (3) Cadle allegedly incorrectly indicated the Consent Judgment was valid and subsisting.  The Motion to Dissolve included an affidavit from Mark Davis that, if uncontroverted and not objected to, provided a basis for the court to dissolve the writ – *i.e.*, testimony claiming that the underlying Consent Judgment was supposedly satisfied.

27.     Pursuant to Texas Rule of Civil Procedure 664a, the hearing on the motion to dissolve is required to be heard within 10 days of filing, but the garnishor is entitled to reasonable notice.  Nonetheless, Glander set the hearing for the next day—April 12, 2006. Neither Keyser nor M&D filed an objection to the hearing setting.

28.     Even though the motion to dissolve was set on 24 hour's notice, Keyser/M&D knew the hearing was coming at least as early as April 3, 2006.  Keyser/M&D had ample time and the obligation to investigate Davis's and Glander's allegations, research and understand the elements required to dissolve a garnishment, determine the evidence that they would need to defeat the motion to dissolve, identify the persons within Cadle possessing knowledge of the events taking place in connection with the 1997 sale of the Comal Property, and advise Cadle on what documents, affidavits, and other information they needed from Cadle.

29.     A motion to dissolve, in essence, is a challenge to the client's affidavit support the application for writ of garnishment.  Once a motion to dissolve is filed, the burden shifts to the judgment creditor to establish that the affiant correctly stated (1) there is a valid subsisting judgment and (2) the debtor does not have assets in Texas sufficient to satisfy the judgment. Therefore, when the motion to dissolve was filed, the judgment creditor's attorney should have known that the matter has just shifted from trying to obtain money from a bank account to

defending a client's sworn testimony and likely a wrongful garnishment claim in a full evidentiary hearing.

30.     The moment a motion to dissolve was raised, M&D, who was orchestrating the garnishment, should have reassessed whether Keyser was qualified to handle the dissolution issues and to determine what team needed to be put into place to make sure the client was competently represented at a dissolution hearing.

31.     M&D knew that Ted Lance was actually involved in another matter M&D was handling for Cadle in San Antonio and would be available to attend the hearing on April 12. Although Lance had been personally involved in the Davis matter from 2003 forward, he had no personal knowledge of the circumstances surrounding the sale of the Comal Property in 1997. That was an issue only Barta could speak to.  There was also no effort made by Keyser/M&D to try to obtain documents from the title company (Alamo Title) that handled the closing of the sale of the Comal Property.

32.     Even though Keyser/M&D were aware that Barta was not going to be at the April 12 hearing, they made no effort to object to the hearing being set on 24 hours' notice following the filing of the motion to dissolve and made no effort to obtain an affidavit from Barta controverting Davis's affidavit.  Under Rule 664a, the Court cannot consider a controverted affidavit in a motion to dissolve hearing.  Therefore, a controverting affidavit from Barta would have, at a minimum, required Davis to appear to testify and subject him to cross examination and forced Davis to overcome the substantial evidentiary problems he had with establishing the fabricated agreement to satisfy the Consent Judgment.  Similarly, Cadle needed to have the right witnesses available and prepared to testify at the hearing.

33.     Given that Davis had previously threatened suit through Raleigh based on Davis's concocted allegation that there was an alleged agreement to satisfy the Consent Judgment in

1997, and given that Davis and Glander (a plaintiff's attorney) raised the issue again in the motion to dissolve, Keyser/M&D were on notice that there was a very real possibility that Davis would claim the garnishment was wrongful, which meant that there was far more at stake at the motion to dissolve hearing than the $3,200.00 garnished.  Namely, a wrongful garnishment claim involves a challenge to the client's affidavit and a claim for damages against the creditor.  In fact, Davis filed a lawsuit[1] against Cadle the morning of the hearing and handed it to Keyser prior to the hearing.  Nonetheless, Keyser/M&D proceeded forward to the hearing without objection and without any plan to present the evidence that would actually be required to prevail. Keyser/M&D put Lance on the stand knowing there was now a lawsuit on file accusing Lance of having filed a false affidavit.

34.    Rule 664a requires affidavit testimony to be admissible evidence for it to be properly considered by the court at a motion to dissolve hearing.  The Davis affidavit and the majority of the documents attached contained either Davis's hearsay or third party hearsay that Davis relied upon to establish the existence of the alleged agreement to satisfy the judgment. The affidavit was also replete with self-serving statements and conclusions, and foundationless claims.  Because Davis did not attend the hearing, Keyser/M&D needed only to file written objections and obtain a ruling on the blatantly inadmissible Davis "evidence" to defeat the motion to dissolve without the need to present any evidence.  Keyser/M&D filed no written objections and made no oral objections to Davis's affidavit, depriving the court of any basis to disregard the evidence submitted by Davis and potentially waiving any complaint about the evidence on appeal.

---

[1] The lawsuit was styled *Mark T. Davis v. The Cadle Company*, Cause No. 2006-CI-05826, in the 408th Judicial District Court, Bexar County, Texas ("Davis Lawsuit").

35.    Lance testified at the hearing, but, not surprisingly, had no personal knowledge of the events from 1993 to 1997, leaving Cadle with no hope of refuting Davis's affidavit concerning the alleged agreement to satisfy the judgment.

36.    The court determined dissolution of the writ was proper and signed an Order Granting Emergency Motion to Dissolve Writ of Garnishment After Judgment ("Dissolution Order").  The court explained she was "troubled by that lack of evidence on Cadle's part of how they treated that $7500 payment" and a gap in collection efforts.  She also mentioned that she understood the issue of whether Cadle agreed to release the Judgment would be "a subject of some other proceeding."[2]  A clear indication from the court that Cadle had failed to carry its burden in the garnishment hearing to establish it still had a valid judgment to collect on.  The court did not rule that she had definitively determined there was an agreement to satisfy the judgment in 1997.

37.    Prior to the hearing, Davis's counsel had prepared the form of the Dissolution Order.  This form of order included a self-serving and improper finding that the writ was being dissolved "for the reason that the subject Judgment has been satisfied."  The form of order also included an award of attorneys' fees, even though there is no legal basis to recover attorneys' fees under the circumstances.

38.    Glander presented the order to the court and Keyser at the hearing.  Not only did Keyser not object to the form of the order, he hand wrote in a signature block and signed the order, even though the order improperly contained a finding of fact, did not accurately reflect the court's findings (*i.e.*, the court never said that she concluded that the Consent Judgment had been satisfied), and improperly included an award of attorneys' fees.

---

[2] Presumably, the trial court in the garnishment action was making reference to the lawsuit filed against Cadle by Davis that morning.

39.     The trial court signed the Dissolution Order as presented, except that she reduced the fee award from $2,000 to $1,000.

40.     It came to light only after that dissolution hearing that (by Keyser's own admission) he had no experience or qualification to handle the garnishment action.  Also, on information and belief, neither Keyser nor M&D made any effort to review the materials relating to the status of the account provided by Cadle before preparing the documents before M&D prepared the application for post-judgment garnishment that Keyser signed.

41.     With the Dissolution Order in hand, which included the finding that the Consent Judgment had been satisfied, Davis had all the ammunition he needed to pursue his claims for wrongful garnishment, breach of contract, and fraud, and no longer had to rely on his flimsy recall of the facts and his even flimsier theory of a 1997 agreement to satisfy the judgment.

42.     Following the hearing, in response to discussions regarding Cadle's objections to Keyser's billing on the matter, Keyser sent the below letter to Cadle:

## THE LAW OFFICES OF
## THOMAS g. KEYSER

2500 BANK OF AMERICA PLAZA
300 CONVENT STREET
SAN ANTONIO, TEXAS 78205
(210) 225-3077
1-800-776-6278
FAX 227-7924
Email: tgk@keyseriawfirm.com

April 27, 2006

Mr. Ted Lance
The Cadle Company
100 North Center Street
Newton Falls, Ohio 44444
FAX: 330-872-5367

RE: Mark Davis

Dear Ted,

Thanks for the phone call about my billing statement. I trust you accepted my version of the statement regarding opposing counsel's five (5) hours of earned legal fees. I billed your company for the time that we expended on behalf of Cadle Company in this case.

I am a family & criminal law attorney here in San Antonio who has had an office affiliation with Martin, Drought and Torres for ten years. I possess know legal expertise regarding collection matters. I did this as an accommodation to the firm at their request. I have provided this same courtesy in over a half-dozen cases in the past without ever submitting a bill for legal services. Most if not all of those cases were defaults or otherwise not heavily contested. This case involving Mark Davis was contested from the onset. If there is something in my statement that needs clarification then please give me a call.

Please find enclosed Mr. Glander's request for payment of his legal fees. I expect to be paid in full regarding this matter. Let me know if Cadle wishes for my office to withdraw from this case to avoid additional legal fees.

Thanks.

Kindest regards,

Thomas g. Keyser

Cc Wade Caldwell
   Mike Colvard

43.     Keyser's letter admitted that he was not qualified to handle the contested garnishment matter, especially in this situation where Cadle was being threatened with a lawsuit. Keyser's letter revealed that M&D had shared an office and worked with Keyser for more than 10 years and that M&D had apparently sought Keyser's assistance on several prior matters.  As a result, Colvard, Caldwell, and M&D were all well aware that Keyser lacked the experience to handle this matter.  The moment the motion to dissolve was brought to their attention, M&D and Keyser should have taken immediate action to replace Keyser with competent counsel to protect Cadle from what transpired.

**E.      Defendants grossly mishandle the Motion for New Trial in the garnishment case.**

44.     After the debacle at the motion to dissolve hearing, Cadle's primary concern was fixing the erroneous Dissolution Order.  Caldwell drafted a motion for new trial and then Caldwell/Colvard/M&D recruited Jesse R. Castillo of Castillo Snyder, P.C. to assist with the motion for new trial and appeal.

45.     The Motion for New Trial and/or Motion to Modify, a joint effort of Castillo and the M&D lawyers, continued the flawed approach to the motion to dissolve that Keyser and M&D had undertaken.  While the motion vaguely contests that there was no factually or legally sufficient evidence to support the court's finding that the Consent Judgment had been satisfied, the motion failed to give Cadle any reasonable chance to persuade the trial court to correct the error in the order or to attempt to complete the record for appeal.

46.     At a minimum, it was crucial for the motion to include evidence of the circumstances surrounding the preparation of the form of the Dissolution Order to the court.[3] The record prepared by Defendants did not make it clear that Glander had prepared the draft

---

[3] The trial courts in Bexar County, Texas, where the Garnishment Proceedings took place, are on a centralized docketing system..

order before ever coming to court at the hearing on the motion to dissolve and that he presented his proposed order on the same day he filed a lawsuit against Cadle wherein Davis was asserting claims based upon an allegation that proceeds from the 1997 sale of the Comal Property allegedly satisfied the Consent Judgment. Glander presented the order on the motion to dissolve the writ of dissolution to the court in the Garnishment Proceedings as if his order reflected the court's ruling and hurriedly got Keyser to sign off on the order and then got the court to sign. As Glander is an attorney and trusted officer of the court, and as Keyser signed off on the order, it is unclear whether the trial court focused on the factual finding in the order at all. These facts could have been presented to the court in a motion to modify by affidavit from Keyser. That did not happen, even though Cadle suggested to the lawyers that it should.

47.     Also, at a minimum, Castillo and the M&D lawyers should have raised the lack of reasonable notice required by Rule 664a, to either get an affidavit from Barta or to have Barta testify in person and submitted an affidavit of Barta to present the testimony that Barta would have offered had Cadle had adequate time.

48.     Unsurprisingly, the Motion for New Trial was denied.

**F.     Defendants grossly mishandled the appeal of the garnishment proceeding.**

49.     Caldwell, who left M&D and moved to Barton, Schneider, & East, L.L.P. n/k/a Barton, East & Caldwell, P.L.L.C. ("BEC"), handled the appeal of the garnishment action styled, *The Cadle Company v. International Bank of Commerce*, No. 04-06-00456-CV, Fourth District Court of Appeals, San Antonio ("Garnishment Appeal"). Again, Cadle's primary ongoing concern was correcting the erroneous factual finding in the Dissolution Order.

50.     As in every prior step along the way, the Appellant's Brief filed by Caldwell/BEC failed to address the procedural foibles that led to the Dissolution Order and, more importantly, the finding that the "the subject judgment has been satisfied." Instead, Caldwell addressed the

facts presented at the dissolution hearing, attacked whether legally and/or factually sufficient evidence was presented to support the dissolution of the writ of garnishment, and attacked the attorneys' fees award.

51.     Importantly, Caldwell failed to address that 24 hours notice of a hearing on a motion to dissolve is unreasonable for an out-of-state party to be able to present a witness or controverting affidavit.   (Of course, this argument was greatly hampered by the Defendants' failure to object to the reasonableness of the notice, introduce evidence that witnesses were unavailable, or to proffer the evidence at the motion for new trial phase that would have been offered at the original dissolution hearing.)

52.     Caldwell also failed to address that, pursuant to Texas Rule of Civil Procedure 299a, findings of fact in a judgment are forbidden.   (Importantly, when this issue was raised in a subsequent appeal, the San Antonio Court of Appeals found that the statement in the dissolution order could not be considered as a finding of fact by the court as "findings of fact in judgments are forbidden and may not be considered on appeal.")

53.     The brief also failed to address the fact that the evidence submitted by Davis at the dissolution hearing was largely inadmissible and, therefore, was not properly considered by the trial court pursuant to Rule 664a.   The brief further failed to address the fact that Davis's affidavit merely controverted Lance's affidavit only on the issue of whether there was a valid and subsisting judgment to support the issuance of the writ.   Because there were controverting affidavits, the trial court was required to consider only live evidence at the hearing.   Davis himself did not attend the hearing and his counsel submitted no evidence at the hearing, but merely relied on the controverted affidavit.   As a result, the brief should have addressed the fact that the trial court had no evidence in front of it to support Davis's theory of a 1997 agreement. But, Defendants failed to raise the issue.

54.     Although the San Antonio Court of Appeals reversed and rendered a take nothing judgment on the attorneys' fees award in the Garnishment Appeal, the court affirmed the dissolution of the writ of garnishment and, because it was not given the opportunity, made no comment on the factual finding in the judgment (*i.e.*, the order dissolving the writ of garnishment).  Importantly, the San Antonio Court of Appeals noted:

> The Cadle Company had the burden to prove that a valid and subsisting judgment existed. . . The Cadle Company failed to introduce any evidence that controverted Davis's testimony. The only representative from The Cadle Company to testify admitted that he was not with the company at the time of the 1997 sale and had not spoken with Bart[a] regarding the parties' understanding. . .  The Cadle Company failed to prove a valid and subsisting judgment. . .  The Cadle Company failed to introduce sufficient evidence to satisfy its burden in the underlying garnishment proceeding.

## G.     Defendants' failures in the garnishment action leave Cadle defenseless in the Davis Lawsuit.

55.     The improper statement inserted by Glander, which Keyser ratified, in the Dissolution Order making an erroneous finding that the "subject judgment has been satisfied" became the highlight of Davis's case against Cadle in the Davis Lawsuit, as did Cadle's failure to carry its burden at the hearing on the motion to dissolve.  Just prior to trial in the Davis Lawsuit, the trial court ruled that Cadle was collaterally estopped from relitigating the issue of whether the judgment had been satisfied by the alleged 1997 agreement based upon the trial court's reliance of the finding in the dissolution order.

56.     At the pre-trial hearing on the collateral estoppel issue in the Davis Lawsuit, Cadle repeatedly argued, among other things, that the issue of the satisfaction of the Consent Judgment was not fully and fairly litigated at the motion to dissolve hearing because Cadle did not have all of its evidence available on short notice and was not able to present its facts.  The trial court was wholly unmoved by this argument and noted that Cadle should have been prepared to defend the garnishment on a moment's notice when it filed the garnishment.  The

court also seemed to be persuaded by the argument of Glander, Davis's counsel, that Cadle had notice that Davis was going to file a motion to dissolve and had the basis for that motion to dissolve at least 8 days before the motion was filed and, therefore, had ample time to get its witnesses and evidence together.  So, even though the hearing was 24 hours after the motion was filed, the court found that Cadle's lawyers had ample time to advise Cadle on the evidence and witnesses needed to controvert Davis's theory about the alleged 1997 agreement and coordinate to make sure that Cadle had Barta available for the hearing or, at the very least, to get an affidavit from Barta.  That never happened.

57.     Following the collateral estoppel ruling, the trial largely became a formality.

58.     Before opening statements, the trial court instructed the jury as follows:

> Therefore, as you listen to the evidence in this case and consider the evidence in this matter, you are instructed to accept as a matter of law that the 1993 judgment of The Cadle Company versus Mark Davis has been satisfied. That issue is not a question for you to have to decide.

59.     After Cadle rested, Davis moved for directed verdict on two elements of the breach of contract claim—the existence of a contract and breach of the contract. Davis's argument for the directed verdict was grounded on the trial court's ruling on collateral estoppel. The trial court granted Davis's motion and included the following instruction in the jury charge: "You are instructed that in 1997 there was an agreement between Davis and Cadle to satisfy the 1993 Consent Judgment and that Cadle has breached that agreement."

60.     The jury returned a verdict in favor of Davis on his claims of wrongful garnishment, fraud, and breach of contract. Davis sought as damages for all three claims the attorney's fees he incurred in 2004 and in the garnishment action, the money paid to Cadle in 2004, and bank service charges.  Davis elected to recover on his contract claim, and the trial court rendered judgment, awarding damages in the amount of $273,926.00, which represents the

actual damages ($20,642.00 for attorney's fees in garnishment action and $85.00 for out-of-pocket), and attorney's fees for preparation of the Davis Lawsuit through trial ($253,199.00).

61.     Cadle then hired new counsel to handle the appeal of the trial in the Davis Lawsuit, styled *The Cadle Company v. Davis*, No. 04-09-00763-CV, the Fourth District Court of Appeals, San Antonio ("Davis Lawsuit Appeal").  The San Antonio Court of Appeals reversed and rendered a take nothing judgment on Davis's fraud claim and reversed and remanded the breach of contract and wrongful garnishment claims for a new trial, finding that the trial court's collateral estoppel ruling and directed verdict based upon that ruling was error.

62.     The second trial began on October 21, 2013.  The issue of whether the Consent Judgment was satisfied was the central issue to be decided by the jury to establish liability on Davis's alleged claims on retrial.  The first day of trial was spent solely on pre-trial matters with the court wherein Cadle's new counsel obtained pre-trial rulings that greatly hindered, but could not completely prevent, Davis and Glander from confusing the jury into believing, among other things, that the Dissolution Order constituted a finding by a trial court that the Consent Judgment was supposedly satisfied.  The case settled on the second day of the trial, before a jury was empanelled, October 22, 2013, with the parties subsequently executing a formal settlement agreement.

63.     At that time, the saga with Davis was finally over, but only after Cadle had spent enormous sums in defending itself in the Garnishment Appeal, Davis Lawsuit, and Davis Lawsuit Appeal, after Cadle diverted several of its key employees to participate in Cadle's defense in the Davis Lawsuit, after having to pay settlement proceeds to Davis to put an end to the litigation with Davis, and after having to forgive the entire Consent Judgment it had against Davis.  All of these damages were the direct and proximate result of one or more acts and omissions by Defendants as set forth herein.

64.     All conditions precedent to Cadle's right to recover have been fully performed or have occurred or have been waived.

65.     When an attorney commits malpractice in the prosecution or defense of a claim that results in litigation—such as in this case, the statute of limitations against the attorneys is tolled until all appeals on the underlying claim are exhausted and the underlying litigation has come to and end.  The conclusion of the litigation with Davis did not occur until October 2013.

## V.
## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

66.     Cadle repeats and incorporates herein by reference each of the foregoing paragraphs.

67.     As attorneys for Cadle, Defendants owed Cadle a duty of care, but Defendants breached their duty of care to Cadle, and Defendants' breach proximately resulted in damages to Cadle.  A lawyer is held to the standard of care that would be exercised by a reasonably prudent attorney and Defendants failed to meet that standard of care.  Defendants breached their duty of care as set forth above, including but not limited to by negligently handling the Garnishment proceedings and by assigning incompetent attorneys to handle certain aspects of those proceedings.  But for Defendants' negligence, Cadle would have prevailed in the underlying litigation, , the Dissolution Order would not have been entered, Davis would not have been able to use the Dissolution Order in the Davis Lawsuit (including but not limited to using the Dissolution Order as grounds for obtaining an estoppel ruling against Cadle), and Cadle would not have had to endure seven years of litigation and substantial expense to defend itself against Davis's claims or to defend against the Dissolution Order.  Defendants' negligent acts were a proximate cause of at least $450,000.00 damages to Cadle.

## VI.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Cadle respectfully requests that Defendants be cited to appear and answer and that, upon final hearing, the Court render judgment against Defendants, jointly and severally, in an amount necessary to satisfy the judgment, plus all applicable pre- and post- interest on same at the maximum allowable rates.  Cadle further requests it be granted all such other and further relief, at law and in equity, to which it may show itself justly entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Jeffrey S. Lowenstein*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jeffl@bellnunnally.com

3232 McKinney Avenue, Suite 1400
Dallas, Texas  75204-2429
Telephone:  (214) 740-1400
Telecopy:  (214) 740-5765

**ATTORNEYS FOR PLAINTIFF**
**THE CADLE COMPANY**

1806691_1.DOCX